# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) **Case number 4:06cv0872 TCM** |
| TRANS STATES AIRLINES, INC., | ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This action is before the Court[1] on the motion of plaintiff, Air Line Pilots Association ("ALPA"), for summary judgment and on the cross motion of defendant, Trans States Airlines, Inc. ("TSA") for summary judgment. [Docs. 17, 21] The underlying dispute is whether two arbitration awards by the Trans States System Board of Adjustment ("the Board"), should be enforced, as argued by ALPA, or should be vacated, as argued by TSA.

## Background

At all times relevant, ALPA and TSA have operated under a Collective Bargaining Agreement ("CBA") that became effective on August 1, 2000. (Def. Stip.[2] ¶ 4.) The CBA provides that a pilot who is disciplined may appeal the action taken by his superiors through

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]"Stip." refers to one party's Statement of Material Facts that is admitted or not disputed by the opposing party.

a specified appeal process. (See Def. Att. A. at 52-53.) Specifically, the CBA allows for a complainant to initially appeal the adverse action to the Vice-President of Flight Operations, or his designee, and then, if unhappy with the result, to the Board. (Id. at 51-52.) The final step in the appeals process is an arbitration hearing before a Board consisting of two members selected by TSA, two members selected by ALPA, and a fifth neutral member ("the arbitrator") selected by the parties from a list of seven neutrals provided by the National Mediation Board, the parties taking turns striking names from the list until one remains. (Id. at 57.)

The rights and duties of the arbitrator are specified in paragraph M, Section 21, of the CBA. (Id.) This paragraph provides, inter alia, that the arbitrator shall "preside at the hearings of the Board and . . . be designated as Chairman." (Id.) Another paragraph, K, provides that decisions made by "the Board in all cases properly brought before it shall be final and binding." (Id.) The CBA does not mandate what processes the Board should use in coming to final decisions after a hearing has been conducted, but does provide that a majority vote of the Board members shall be competent to make a decision. (Id.; Def. Stip. ¶ 11.)

The CBA does not explicitly permit or prohibit any right to discovery by ALPA or by TSA.[3] The CBA does, however, grant to the arbitrator the authority to subpoena both witnesses and evidence. (Def. Att. A at 57, Sec. 21, ¶ M of the CBA). David J. A. Hayes,

---

[3]Sections 20 and 21 of the CBA sets forth the regulations governing grievances and hearings before the Board. (Def. Att. A at 51-58.)

III, Vice-President and General Counsel for TSA, was TSA's negotiator during contract negotiations with ALPA for the CBA at issue. (Hayes Decl. ¶¶ 2-3.) He avers that ALPA made repeated proposals during those negotiations for the right to engage in discovery before a Board hearing. (Id. ¶ 7.) TSA opposed these proposals on the grounds that such rights would complicate a process meant to be "efficient and expeditious." (Id. ¶ 8.)

The Cvetanovic Case. The first award at issue is one involving Captain Srdjan "Sergio" Cvetanovic. He was employed by TSA on February 8, 1999.[4] On February 2, 2004,

he was assigned to pilot TSA Flight #5294 ("the Flight") from Pittsburgh to St. Louis. (Def. Att. D,[5] v. 1 at 35.)

On this date, Kevin Padden, an off-duty TSA pilot, arrived at the gate seeking to ride aboard the Flight in a non-revenue status. (Davis Decl. Ex. 5 at 2.) He was accompanied by another off-duty TSA pilot, Kristi Munn, who also wanted to ride the Flight in a non-revenue status. (Def. Att. G at 2; Davis Decl. Ex. 5 at 3.) Padden informed Patricia Doyle, the gate agent,[6] that he wanted to fly to St. Louis on a non-revenue status and Munn told her that she wanted to "jump seat" on the plane. (Def. Att. D., v. 2 at 102.) Munn testified at

_____

[4]Paragraph 12 of the Statement of Undisputed Material Facts states that his employment with TSA began in August 1999. The TSA seniority roster lists February 8, 1999, as the date he began working. (Def. Att. A at 119.) Additionally, his testimony before the Board was that he began working on February 8, 1999. (Def. Att. D, v. 1 at 30.) The Court will use the February 1999 date. The accuracy of this is not relevant to the disposition of the issues.

[5]TSA's Attachment D is the transcript of the hearing before the Board.

[6]Doyle was employed by the airport, not TSA.

the Board hearing that Doyle could smell Padden's breath as soon as he opened his mouth. (Id.)  Doyle gave Munn  a look to indicate that she had noticed his breath.  (Id.)  Padden suggested that he and Munn go get a drink; Munn told Doyle not to worry, they would go get some coffee.  (Id. at 103.)  Padden and Munn then went to get milkshakes at a nearby concession.  (Id. at 104.)

Padden was wearing a TSA crew identification around his neck.  (Def. Att. D, v. 1 at 70.)

While they were gone, Cvetanovic arrived at the gate and had a conversation with Doyle.  (Pl. Ex. 5 at 3.)  The nature of this conversation is disputed.  Cvetanovic testified at the Board hearing that Doyle merely informed him that some off-duty crewmembers would be flying on his plane, that they were tired, and that she had given them a row to sleep in; she did not mention that anyone was intoxicated.  (Def. Att. D, v. 2 at 36.)  TSA counters that Doyle did inform Cvetanovic about an intoxicated passenger.  (Id. at 57.)  However, Doyle was not available to testify at the Board hearing.  (Id.)  Doyle's deposition, taken after Cvetanovic's termination and as part of administrative proceedings before the Federal Aviation Administration ("FAA"), was admitted at the hearing, subject to reservations about its weight given the lack of cross-examination of her on behalf of Cvetanovic.[7]  (Id. at 63.)

Regardless, after this conversation, Cvetanovic entered the plane and was seated in the cockpit along with the Flight's First Officer, Earl Simmons.  Padden and Munn boarded

---

[7]This deposition is not before the Court.

the plane shortly after. (Davis Decl. Ex. 5 at 3.) It is undisputed that during the boarding process, both Cvetanovic and Simmons were going through the pre-flight checklist and not paying attention to the passengers getting on the plane. (Def. Att. D, v. 1 at 10-11, 37.)

To board the plane, a passenger had to walk down a jet bridge, descend a flight of stairs from the jet bridge to the ground, walk across the ground, and then climb up the aircraft stairs. (Id. at 66.) Padden fell down the jet bridge stairs. (Id.) Alicia Greer, the flight attendant, testified that Padden looked drunk. (Id. at 67.) Munn testified that he stumbled, but did not fall, as a result of trying to handle both of theirs roll-on suitcases. (Def. Att. D, v. 2 at 104-05.) It does not appear that Cvetanovic would have seen Padden boarding the plane. (Def. Att. D, v. 1 at 10, 37-38.)

Padden was then seated in seat 2A. (Id. at 68.) Before the door closed, Greer spoke with Cvetanovic, although the exact nature of this conversation is disputed. Greer testified that at this point in time she told Cvetanovic that "we were going to have a problem" with an intoxicated passenger, referring to Padden. (Id. at 69.) She further testified that Cvetanovic responded that they needed to get Padden to go to sleep. (Id. at 70.) Munn also told Greer that Padden would sleep the whole flight. (Id. at 98.)

Cvetanovic and Simmons testified that Greer merely informed them that "it looks like we have a passenger . . . who's been drinking."[8] (Def. Att. D, v. 2 at 12, 38.) Both further

---

[8]Several witnesses testified at the Board hearing that TSA directed its employees to be careful when using the terms "intoxicated" or "drunk" when referring to passengers as this had apparently previously been an issue with TSA.

testified that Cvetanovic confirmed with Greer that the passenger in question did not appear to be causing any trouble, and then made the decision to proceed with the scheduled departure. (Id. at 14, 42.) Simmons also testified that "drinking and then being intoxicated or drunk or two different things . . . So if I hadn't heard . . . those words ["drunk" or "intoxicated"], I would not have thought that the captain had heard them." (Id. at 14-15.)

After the brief discussion between Cvetanovic and Greer, the door to the plane was closed, and the plane began to taxi for takeoff. As Greer began to demonstrate the safety features of the aircraft, Padden made faces, patted her rear end, and then began coughing and gagging. (Def. Att. D, v. 1 at 99.) She asked another crew member what to do; it was suggested she inform the front that the aircraft had to be turned around and the passenger deplaned. (Id. at 100.) She did so, and as she waited to open the aircraft door, she saw Padden hit the passenger seated next to him. (Id.) Simmons recalled that Greer told them that the passenger was throwing up and Cvetanovic replied that they were returning to the gate. (Def. Att. D, v. 2 at 15.)

After the aircraft returned to the terminal, Padden[9] was removed and the aircraft resumed its scheduled flight. (Id. at 16, 43.)

During this flight, Greer wrote a report on the incident for her superiors. (Def. Att. D., v. 1 at 110; Davis Decl. Ex. 5 at 4.) After arriving at St. Louis, Cvetanovic and Greer discussed this report. Greer testified that Cvetanovic asked her to remove certain items of

_____

[9]Padden was terminated as a result of this incident. (Def. Att. D, v. 1 at 9.)

information from the report, including the fact that there had been an intoxicated passenger aboard, and that Cvetanovic was threatening toward her.  (Def. Att. D, v. 1 at 114, 116.)  On the other hand, Cvetanovic testified that he merely believed the report was too general and needed to be more specific and concise.  (Def. Att. D, v. 2 at 45.)  He was only upset with her because she had been telling the story to the oncoming flight crew, and, he informed her, there was "nothing funny about somebody potentially losing his job."  (Def. Att. D, v. 2 at 46.)

Upon arrival in St. Louis, Cvetanovic's shift was over and he was considered off-duty. (Pl. Ex. 5 at 4.)  En route to his hotel, he was reached on his cell phone by a member of TSA's Flight Management, Captain Sanjay Patel.  (Id.)  Patel was then serving as Flight Operations Manager in St. Louis.  (Def's Att. D, v. 1 at 46.)  Patel testified that he asked Cvetanovic to immediately file a report.  (Id. at 50.)  In a later conversation, he also requested, at the direction of Captain Mike White, TSA's chief pilot, that Cvetanovic come in to speak to White about what had happened on the plane.  (Id.)  Patel further testified that Cvetanovic refused to come in until he had union representation.[10]  (Id. at 51.)  Patel informed him that he was not in trouble and that the focus of the meeting was to get information.  (Id. at 51-52.)  He also told Cvetanovic that he worked for TSA, not for the union.  (Id.)  Another officer in Flight Management, Captain Stuart Scott, also requested that

---

[10]The CBA provides, in relevant part, that "a pilot who is or may be disciplined may be represented by a representative of his choice, provided that the pilot's selection of a specific representative does not cause an unreasonable delay in the proceeding."  (Def. Att. A at 53.)

Cvetanovic file a report and come in to talk with White. (Id. at 30-31.) Cvetanovic declined to do so until he had union representation. (Id. at 31.)

Cvetanovic testified that his conversations with Patel were hostile in nature. (Def. Att. D, v. 2 at 69-70.) He thought he might be facing disciplinary measures, and wanted to speak to a union representative before meeting with White. (Id. at 58, 69-70.) Another pilot told him he should definitely have union representation. (Id. at 57.) He attempted to call several individuals, none of whom were available to accompany him to a meeting. (Id. at 69-70.) Cvetanovic also testified that he offered to bring his report by that day, but was told by Patel to bring it in the next day. (Def. Att. D., v. 2 at 53.) Cvetanovic sent the report by facsimile transmission that evening. (Id.) On the other hand, Patel testified that he told Cvetanovic that they needed his report immediately. (Def. Att. D, v. 1 at 47.) Patel assumed the report was filed within the required twenty-four hour period, and there was no evidence to the contrary. (Id. at 50.) Cvetanovic's last conversation with Patel was when Patel informed he was suspended. (Def. Att. D, v. 2 at 59.)

Later that day, at approximately 3:45 in the afternoon, Jason Kagan, who at that time served as the Master Executive Counsel Grievance Committee Chairman, called White and offered to bring Cvetanovic over to meet with him within the hour. (Def. Att. D, v. 2 at 94, 96-97.) In the Board's statement of facts, portions of the cross-examination of White were repeated, including a reference to the conversation with Kagan occurring after 5 o'clock.[11]

---

[11]The transcript of the hearing filed by TSA ends before White's cross-examination.

(Davis Decl. Ex. 5 at 5.)  It is undisputed that White declined to meet because it was too late in the day.  Shortly thereafter, Cvetanovic and a union representative, Captain Paul Thoren, met with White, Patel, and Scott.  (Def. Att. D, v. 2 at 60.)  The incident involving Padden was not discussed.  (Id.)  Instead, the subject was Cvetanovic's refusal to come in when ordered on February 2.  (Id. at 60-61.)

On February 16, White wrote Cvetanovic a letter informing him of his immediate termination from TSA. (Compl. Ex. 1.)  Three reasons for the termination were given:  (1) allowing a passenger to board while intoxicated, in violation of provisions of the General Operations Manual ("GOM") and of Federal Aviation Regulations ("FARs")[12]; (2) using his position as captain to attempt to coerce a flight attendant to alter or change her report, in violation of the regulations; and (3) refusing to meet with White, in violation of § 20.B.3 of the CBA, thereby "causing an inexcusable delay in this investigation."  (Id.)  ALPA immediately filed a grievance contesting the termination.  (Def. Stip. ¶ 7.)  The grievance was denied at the initial stages and, as noted above, was submitted to the Board.  (Id.)

While the grievance was pending before the Board, the FAA was investigating the Padden incident.  On April 16, the FAA notified TSA of a proposed civil penalty.  (Def. Att. F.)  By order entered November 8, the FAA concluded that TSA had violated FAR § 121.575(c), 14 C.F.R. § 121.575(c), by allowing an intoxicated passenger to board.  (Id. at 2.)  This conclusion was based, in part, on its finding that "[a] flight attendant [had]

_____

[12]FARs prohibits the boarding of a passenger who "appears to be intoxicated"; the GOM prohibits the boarding of a passenger who is "obviously intoxicated."

notified the Captain that the passenger was obviously intoxicated and with full knowledge, the Captain permitted the passenger to be boarded." (Id. at 1.)

Also while proceedings were pending before the Board, the FAA acted against Cvetanovic, suspending his license to fly for sixty days as a result of Padden boarding his Flight. (Davis Decl. Ex. 10.) The reason given was that Cvetanovic "allowed an obviously highly intoxicated non-revenue crew passenger to board the flight despite crew members' advising you of the passenger's condition." (Id. at 1.) This decision was appealed to the National Transportation Safety Board ("NTSB") and heard before an administrative law judge ("ALJ"). (Pl. Stip. ¶ 10.) Two witnesses testified on behalf of the NTSB: Greer and an FAA representative who had reviewed the reports and recommended the suspension. (Davis Decl. Ex. 11 at 6, 8.) Two witnesses testified on behalf of Cvetanovic: Simmons and Cvetanovic. (Id. at 9.) The ALJ found that Padden was intoxicated, Greer sufficiently communicated this fact to Cvetanovic, and, regardless, Cvetanovic pushed back and started taxiing for take-off, thereby violating FAR § 91.17B, 14 C.F.R. § 91.17(b),"which states that no pilot of a civil aircraft may allow a person who appears to be intoxicated . . . to be carried in that aircraft[.]" (Id. at 6, 15.) The ALJ further found, however, that the NTSB had not established the "two most critical allegations" in the order of suspension that Cvetanovic had allowed "an obviously highly intoxicated non-revenue passenger to board the flight" or that "the passenger's behavior became so belligerent, abusive, disruptive, and dangerous" that the flight had to return to the gate. (Davis Decl. Exs. 10 at 1 and 11 at 14.) The former was not established because, although Padden was "identified as possibly being intoxicated" he was

not described to Cvetanovic as "obviously highly intoxicated"; the latter was not established because the evidence was that the flight was returned to the gate because Padden became sick. (Davis Decl. Ex. 11 at 14-15.) The ALJ concluded that the appropriate sanction was a thirty-day suspension, not the sixty-day suspension previously imposed. (<u>Id.</u> at 16.)

Meanwhile, a month before the ALJ's decision, a hearing was held before the Board on Cvetanovic's appeal. (Def. Att. D.) Gil Vernon served as the neutral member, or arbitrator. (Def. Stip. ¶ 7.)

Before the hearing, Neal Davis, the attorney representing Cvetanovic, sent a letter to Hayes, the attorney for TSA, requesting certain files, including, among other items, Cvetanovic's employment file, documents relating to discipline imposed on pilots by TSA for similar allegations, documents relating to discipline imposed on other TSA employees for the Padden incident, and a list of witnesses TSA intended to call at the hearing. (Davis Decl. Ex. 7.) His request was declined. (Davis Decl. ¶ 4.) During a teleconference between Davis, Hayes, and Vernon, Vernon directed TSA to produce some, but not all, of the requested documents.[13] (<u>Id.</u> ¶ 7.)

Following the hearing before the Board, Vernon issued a draft decision. (Pl. Stip. ¶ 8.) Following an executive session of the Board, Vernon issued his final opinion. (<u>Id.</u>) In that opinion, he described the meeting between White and Cvetanovic as follows:

---

[13]Hayes and Davis disagree about whether Hayes objected to this ruling and about whether the ruling is consistent with the CBA.

Both White and [Cvetanovic] agreed that, at that meeting, no questions were asked about the flight involving the intoxicated passenger. Instead, the focus was on why [Cvetanovic] did not report to White's office. White's language was colorful. He agreed he told [Cvetanovic], something to the effect, he had to "show his ass right away" when requested. While denying he called [Cvetanovic] "an arrogant son-of-a-bitch," he acknowledged telling [Cvetanovic] he was "acting like an arrogant son-of-a-bitch." According to [Cvetanovic], White was also disrespectful, condescending, and yelling (not letting [Cvetanovic] say anything). He also testified White said "I don't care what you do, if its some family matter or not family matter. I don't care if you are in the Sudan. I want your ass in my office when I call you, yes or no answer?" According to [Cvetanovic's] testimony, when [Cvetanovic] said he couldn't give him a yes-or-no answer that: ". . . at that point in time he calls me the most arrogant son-of-a-bitch and tells me I may not talk anymore. . . ."

(Davis Decl. Ex. 5 at 5-6.) Vernon considered the main concern behind the insubordination charge in the termination letter to be the delay it caused in the investigation of the Padden incident. (Id. at 16.) He then discussed White's behavior during cross-examination,[14] giving the following example:

Q. And since 9/11, are cockpit crew members advised not to leave the cockpit?

A. Excuse me. If I'm going to answer the questions, I don't need the funny farm over here making faces thinking I'm lying, so if that's going to be the case, Id just as soon they leave, and I'll talk directly to you.

(Id. at 18.) Vernon explains that White was referring to conduct by union representatives present in the hearing room and that he (Vernon) "heard and saw nothing." (Id. at 17.) Vernon concluded that White's behavior "reinforced, as reasonable, [Cvetanovic's] desire for a Union representative." (Id.) Vernon further concluded that, while TSA needed to

---

[14]As noted above, this portion of the transcript is not in the record before the Court.

expeditiously investigate the Padden incident, the proper course was for TSA to set a reasonable time limit within which Cvetanovic had to obtain union representation rather than to essentially insist that he did not need it. (Id. at 18-19.) Moreover, the evidence established that Cvetanovic did not intent to interfere with TSA's investigation by requesting a union representative; indeed, he answered Scott's questions and spoke with Patel although he had no obligation to be available on his day off. (Id. at 19.) Any problem, Vernon found, was attributable to White's "lack of patience." (Id.)

Vernon further found that the charge involving Greer was groundless:

> [TSA] has never articulated what regulation [Cvetanovic], allegedly, coerced the flight attendant into violating and he clearly never told her not to write a report. [Cvetanovic] did comment on the length of the report and that it contained a lot of irrelevant information (which is true). However, these comments – which were made on-board and witnessed by Munn and Simmons – were not communicated in a threatening tone. Such a suggestion isn't, per se, misconduct. Even Capt. White couldn't resist editorializing and suggesting to Munn[15] she modify her report. As for [Cvetanovic] suggesting Greer leave [Padden's] name out of the report, this is troublesome. However, the evidence shows this was, ultimately, not a cover-up and, at worst, was intended to limit embarrassment to [Padden]

.
(Id. at 20.) Greer's testimony about conversations with Cvetanovic that were not overheard by anyone else Vernon found to be not credible.[16] (Id. at 21.) Vernon did find, however,

---

[15]The portion of White's testimony submitted does not include this reference; consequently, the Court can not determine whether White was referring to Greer and Vernon made a mistake or whether he was referring to Munn.

[16]The majority of Greer's testimony was produced from her original deposition as she could not recall at the hearing much of what happened at the time. At one point, TSA's counsel moved to treat her as a hostile witness because her testimony had changed between the time of her deposition and the hearing. (Def. Att. D, v. 1 at 85.) For instance, Greer testified at the hearing that Cvetanovic wanted her to shorten her report, not change it, and that he did not threaten her; she

that Cvetanovic had erred by hoping that Padden would not be a problem and not making a careful decision about his state of intoxication.  (Id. at 22.)  He further found that there was a "disconnect" between the FARs and the GOM about what that state is for a passenger to be prohibited from boarding, i.e., the first barring someone who "appears" to be intoxicated and the second someone who is "obviously" intoxicated.  (Id. at 21.)

This error in judgment did not justify termination.  (Id.)  Cvetanovic's conduct was "simply negligence rather than gross negligence."  (Id.)  "Moreover, he has no prior record and neither the flight attendant nor the gate agent was discharged."  (Id.)  Although TSA was entitled to discipline Cvetanovic with a thirty-day suspension, Vernon concluded, it did not have "just cause" to terminate him.  (Id. at 23.)  He directed TSA to reinstate Cvetanovic and pay him all lost earnings and associated benefits beginning from March 16, 2004, forward, minus any time he was unavailable due to the FAA action and less any interim earnings. (Id.)

ALPA requests that this Court enforce that award.  TSA opposes enforcement, arguing that Vernon (1) exceeded his jurisdiction by reinstating Cvetanovic after implicitly finding that he was terminated; (2) violated well-established public policy; and (3) violated the terms of the CBA, exceeded his authority, and denied TSA due process by allowing for discovery by ALPA.

The Hopkins Case.  The second award at issue involves Captain Paul Hopkins.

---

testified otherwise in her deposition.

Hopkins was employed by TSA as a pilot from July 13, 1998, until his discharge on March 16, 2005. (Def. Stip. ¶11.) On that date, he was terminated by Captain Stuart Scott, see page 8, supra, for "fraudulent non-revenue travel." (Compl. Ex. 6.)

As a pilot for TSA, Hopkins was eligible under § 26(O) of the CBA to receive various employee travel pass privileges. (Def. Att. A at 85-86.) At all times relevant, there were three forms of passes: (1) personal; (2) "buddy" passes; and (3) business. (Compl. Ex. 9 at 2.) The CBA governed only the "buddy" pass, providing that a pilot would receive two "buddy" passes for any quarter in which he or she maintained perfect attendance and, should the pilot maintain perfect attendance for the year, two additional "buddy" passes. (Id. at 3; Def. Att. A at 85.) All passes were non-transferable and were to be used only by the authorized person whose name appeared on the pass. (Compl. Ex. 9 at 4.)

Also at all times relevant, Paula Gregory was the Manager of Employee Travel for TSA and, as such, was to issue the various passes to TSA's pilots. (Id. at 2.) "While [Hopkins] was employed, Ms. Gregory did not issue passes for 'Buddy Pass' travel, except in exigent circumstances, when . . . [she] would ordinarily require the pilot to produce authorization from a flight manager or an attendance letter stating the 'Buddy Pass' had been earned." (Id. at 2-3.) This authorization was required because she did not have access to the information necessary to establish a pilot's eligibility for such a pass. (Id. at 4.)

Personal travel passes allow employees and eligible family members to travel free. (Id. at 3.) The same form is used for personal passes and for "buddy" passes. (Id.) "When issuing a pass ticket for personal travel, Ms. Gregory usually check[ed] the box indicating

personal and use[d] a validator stamp to indicate the date of issue." (Id.) She also included

such identifying information as the passenger's name and the employee's hire date, position,

and identification number. (Id.) If, however, she knew the pilot well and trusted that pilot

not to abuse the pass privilege, she would issue a blank pass ticket. (Id.) She sometimes did

so for Hopkins. (Id.)

One such time was on November 6, 2003. (Id.) She issued him a pass ticket, signed

the ticket, and validated it with the stamp. (Id.) She did not fill in any other employee or

passenger information. (Id.) She did not indicate on the pass whether it was personal or

"buddy." (Id.) Hopkins did not use this pass. (Id. at 4.) Greer[17] attempted to use it on

February 16, 2005, to board a flight from St. Louis to Richmond. (Id. at 3.) At the time, she

no longer worked for TSA. (Id.) The issue date on the pass had been manually altered from

November 6, 2003, to indicate a November 6, 2004, issue date.[18] (Id.) The pass was

confiscated. (Id.)

Two days later, Captain Michael White, see page 7, supra, told Scott to investigate

the fraudulent use of a travel pass issued to Hopkins. (Id. at 4.) Consequently, on February

21, Scott met with Hopkins, Mike Boshcert, a flight manager, and Dario Miranda, a union

representative. (Id. at 4.) Scott informed Hopkins that a pass issued to him was being

---

[17]This is the same woman who was the flight attendant involved in the Padden incident.

[18]With a "2003" issue date, the pass would have been expired for several months. (See Pl.
Compl. Ex. 9 at 3.)

fraudulently used and asked him if knew anything about it.  (Id.)  Hopkins replied that he did not.  (Id.)  He was suspended pending a further investigation.  (Id.)

After White was informed by Greer that Hopkins had given her the travel pass and, in turn, told Scott about Greer's disclosure, Scott held another meeting with Hopkins, Miranda, then participating by telephone, and Captain Randy Zehnder.  (Id.)  Hopkins explained at this meeting that he had obtained the travel pass for his father.  (Id.)  He did not know it had been altered and the alteration was not in his handwriting.  (Id.)  He knew Greer; "she was frequently present at his crash pad."[19]  (Id.)  He had not given her the travel pass, but she may have taken it off the dresser in his "crash pad."  (Id.)  Asked if she had stolen the pass, Hopkins replied that he did not want to accuse her of such and she may have "just borrowed it."  (Id.)  "By [Hopkins'] own admission, he was 'hedging' during this meeting and was not telling the whole truth."  (Id.)  He never admitted giving Greer the pass.  (Id.)

Scott subsequently made a decision, with the approval of White, to terminate Hopkins' employment.  (Id.)  Hopkins was officially terminated on March 16, 2005, for "'abuse, misuse or falsification' of travel pass privileges."  (Id.)  Specifically, Scott believed that Hopkins had either given the pass to Greer to be used, or, "at the very least," had had the pass sitting out in the open, expired for several months, and obtained for fraudulent use by a terminated employee.  (Id. at 4-5.)

---

[19]The "crash pad" is presumably a place where a pilot sleeps overnight between shifts.  There is no indication in the record of any specifics about Hopkins' "crash pad."

A provision in TSA's GOM allows for the termination of employees for improper use of travel privileges. (<u>Id.</u> at 5.) Specifically, if a travel pass obtained as a result of employment with "is misused, abused, or falsified," the employee shall be dismissed. (<u>Id.</u>)

Hopkins filed a grievance on his termination. (Def. Stip. ¶ 11.) The grievance was denied at the preliminary stages and following a hearing at which Hopkins did not present any evidence or explanation. (<u>Id.</u>; Compl. Ex. 9 at 5.) In November 2005, a hearing was held before the Board at which John Flagler served as the neutral member, or arbitrator. (Def. Stip. ¶ 11.)

As in the Cvetanovic proceedings, see page 11, supra, before the hearing, Davis, the attorney representing Hopkins, sent a letter to Hayes, the attorney for TSA, requesting certain files, including, among other items, Hopkins' employment file, TSA's investigation file on the investigation, and documents relating to discipline imposed on pilots by TSA for similar allegations. (Davis Decl. ¶¶ 11 and Ex. 13.) Hayes denied the request on the grounds that the CBA did not provide for pre-hearing discovery. (Hayes Supp. Decl. ¶ 6.) As a result of two teleconferences between Davis, Hayes, and Flagler, Flagler directed TSA to produce some, but not all, of the requested documents.[20] (Davis Decl. ¶ 12.)

Eight witnesses testified at the Board hearing. (Compl. Ex. 9 at 2.) The primary factual witnesses were Gregory and Hopkins. The transcript of the hearing was not

---

[20]As in the Cvetanovic case, Hayes and Davis disagree about whether Hayes objected to this ruling and about whether the ruling is consistent with the CBA. Also, as in the Cvetanovic case, TSA eventually did comply to avoid any negative inference as a result of a failure to cooperate. (Hayes Decl. ¶ 14.)

submitted to the Court; however, Flagler's decision includes summaries of some testimony and excerpts of other testimony. For instance, Gregory testified on direct examination that, except for emergencies, she did not issue "buddy" passes to pilots. (<u>Id.</u> at 17.) However, she did not check the box marked "personal" on Hopkins' travel pass at issue; she explained that it was an omission on her part. (<u>Id.</u>) "[TSA's] reliance on Ms. Gregory to establish that [Hopkins] requested and she issued him a personal pass was considerably weakened on cross-examination." (<u>Id.</u>) Her testimony on cross-examination about issuing blank passes to pilots, "which they were free to fill in as Buddy Passes later on their own," contradicted her testimony on direct examination that she would have directed Hopkins to the flight department had he requested a "buddy" pass. (<u>Id.</u> at 18.) Asked why she had left portions of the pass given Hopkins blank, she explained on cross-examination that it was an oversight, she was one person to 1,800 people, and she trusted him. (<u>Id.</u>) Flagler concluded, "[t]his leaves only the witness' demonstratably [sic] imperfect memory as support for [TSA's] critical charge that [Hopkins] converted a de facto personal pass into a Buddy Pass." (<u>Id.</u> at 19.)

Hopkins testified that he gave Greer a "buddy" pass and that to do so was an error in judgment. (<u>Id.</u> at 15.) Rejecting TSA's claim that he need not address proof of wrongdoing because Hopkins "virtually admitted to the charge for which he was discharged" and citing two dictionary definitions of "fraudulent"[21] that required an "intent to deceive," Flagler found

---

[21]Flagler cited the definition of "fraudulent" in <u>Webster's New Century Dictionary</u> and in the Fifth Edition of <u>Black's Law Dictionary</u>. (Compl. Ex. 9 at 14.)

that Hopkins' "unequivocal denials of intent to defraud have the effect of rebutting [TSA's] contention that he admitted to committing fraudulent use of the pass or participating in such dishonesty." (Id. at 14, 16.) Consequently, TSA "assume[d] the burden of proof by its own independent evidence and argument that [Hopkins] committed the misconduct cited in his letter of termination, i.e., Fraudulent Non-Revenue Travel. Such charge involving as it does elements of criminal intent and moral turpitude raises the standard of proof." (Id. at 16.) Hopkins undisputedly "hedged and equivocated about his answers to Captain Scott's questions [and] . . . changed his original position from claiming it was a personal pass for his father to the later version of it being a "buddy" pass. (Id. at 17.) He also admitted that he placed an "X" in the space on the pass marked for "buddy" rather than in the space for a personal pass. (Id.) TSA did not, however, carry its burden of establishing that the it was a personal pass before Hopkins placed the "X." (Id. at 17-19.) Nor did TSA carry its burden of establishing that Hopkins participated in the fraudulent use of the travel pass. (Id. at 19.) Specifically, there was not "a shred of evidence to support the necessary element of intent by [Hopkins] to deceive or cheat [TSA] of anything of value – much less that he was even present at the time Greer's falsification of the pass took place. Neither can be shown that [Hopkins] 'coached' or 'instructed' Ms. Greer on how to falsify certain information on the pass in order to use it for her unauthorized travel." (Id.)

Flagler further found that "any lingering doubts" about the correctness of the termination were eliminated by comparing Hopkins' treatment to that of another TSA pilot,

Pablo Cruz Denis.[22]  (Id.)  Denis was charged with four disciplinary violations, including

obtaining companion passes for people who were not eligible and fraudulently obtaining

passes.  (Id.)  He did not challenge the charges and was given a seven-day unpaid suspension

and a one-year suspension of his pass privileges.  (Id. at 19-20.)  Flagler rejected TSA's

arguments that the two cases were not comparable because Denis (a) violated a different

policy than did Hopkins, (b) cooperated in the investigation, and (c) gave the travel pass to

his pastor, not to a terminated employee.  (Id. at 20.)  Flagler also found that TSA had

violated the CBA by not including a "'short concise statement of facts on which the discipline

is based'" and that the Union was not given the opportunity to examine the actual pass at

issue until the arbitration hearing.[23]  (Id. at 21 (quoting § 20(B)(1)(b) of the CBA)).  The

latter was relevant because "the stamped date on the face page was so light as to be hardly

---

[22]Flagler noted that considering evidence of disparate treatment in two disciplinary cases was
an exception to the typical arbitration case.

> Ordinarily arbitration authority advises that arbitral review and decision be limited . . .
> to only those findings necessary to a correct resolution of the matter submitted.  In
> the present case, however it is useful to also address the major due process concerns
> raised by the Union – that of disparate treatment, negligence in supplying facts in the
> termination letter, and refusing to provide Union timely with the face pass.

(Id. at 19.)  (Alteration added.)


[23]Hopkins was shown the pass at the second meeting with Scott.  (Compl. Ex. 9 at 4.)
Miranda, the union representative, participated in this meeting by telephone and, consequently, did
not personally examine the pass.

legible" and supported Hopkins' contention that he could not tell by glancing at the stamp that it had expired.  (Id.)

Flagler sustained the grievance and ordered Hopkins reinstated, upon completion of certain training requirements, with back wages and lost benefits.  (Id. at 22.)  The decision is dated May 8, 2006.  (Id.)  Appended to the decision are separate pages indicating the concurrence of the two ALPA Board members, one dated May 18, 2006, the other dated May 15, 2006.  (Id. at 23, 24.)

One of the TSA members of the Board, Eric G. Kukowski, avers that a discussion was held off-the-record among the five Board members and the parties' counsel about the procedures for distributing the Board's draft decision.  (Kukowski Decl. ¶ 7.)  It was agreed that Flagler's draft opinion would be distributed to other Board members followed by, should either party request, an executive session of the Board.  (Id.)  He heard nothing of any opinion being drafted or distributed until informed on May 24, 2006, by Hayes of a final decision issued by Flagler and signed by the ALPA Board members.  (Id. ¶ 8.)  Kukowski then contacted Flagler and was told by him that his secretary had inadvertently sent the decision to the principals for TSA and ALPA instead of the Board members.  (Id. ¶ 9.)  Flagler said he would correct the mistake and schedule a Board telephone conference to address the error.  (Id. ¶ 10.)  No conference was scheduled.  (Id.)  TSA argues that this circumvention of the agreed-upon procedure resulting in no executive session being held means that Flagler's decision is not a final and binding decision.

ALPA disagrees. Davis avers that Flagler's decision to mail his award to the attorneys for distribution to Bard members was not unusual. (Davis Decl. ¶ 13.) When he received the award, he forwarded it to the ALPA Board members and assumed that the attorney who had represented TSA, William Jones, had similarly forwarded it to the TSA Board members. (Id. ¶ 14.) He also avers that the typical practice was for ALPA or TSA to request an executive session at either the Board hearing or immediately following the award. (Id.) Neither he nor the ALPA Board members had ever been informed that TSA wished an executive session. (Id.) ALPA characterizes the telephone conversation between Kukowski and Flagler as "an improper ex parte conversation" of which ALPA had no knowledge. (Pl. Resp. to Def. Stat. of Uncontroverted Facts, ¶¶ 33-34.)

ALPA requests that this Court enforce Flagler's award. TSA argues that the award should be vacated because (1) Flagler violated Sections 3, First (j) and (n) of the Railway Labor Act, 45 U.S.C. §§ 153, First(j), (n), and the CBA by failing to confer with TSA's Board members before issuing his final ruling, and (2) Flagler's order allowing for discovery by ALPA violated the terms of the CBA, exceeded his authority, and violated TSA's due process rights.

### Discussion

Standard of Review under the Railway Labor Act. "Judicial review of an arbitration award is very limited, and review of the decision of a public arbitration board under the Railway Labor Act[, 45 U.S.C. §§ 151-188, ("RLA")] 'is among the narrowest known to the law.'" **Finley Lines Jt. Protective Bd. Unit 200 v. Norfolk Southern Ry. Co.**, 312 F.3d

943, 946 (8th Cir. 2002) (quoting Bhd. of Maint. of Way Employees v. Terminal R.R. Ass'n, 307 F.3d 737, 739 (8th Cir. 2002)) (alteration added).  Under this narrow standard of review, courts may not review an arbitrator's decision on the merits "'despite allegations that the decision rests on factual errors or misinterprets the parties' agreement[.]'" **Id.** (quoting Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001)) (alteration added). Instead, "[a]n arbitration award may be set aside on three grounds only: (1) the Board's failure to comply with the provisions of the [RLA]; (2) failure of the order to confine itself to matters within the scope of its jurisdiction; or (3) fraud or corruption." **Bhd. of Maint. of Way Employees v. Soo Line R. Co.**, 266 F.3d 907, 909 (8th Cir. 2001)) (alteration added) (citing 45 U.S.C. § 153, First (q)).  Thus, "as long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely a brand of industrial justice, the award is legitimate." **Id.** (citing United Paperworkers Int'l v. Misco Inc., 484 U.S. 29, 38 (1987)).  "'[C]ourts . . . have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim." **Garvey**, 532 U.S. at 510 (quoting Misco, 484 U.S. at 13) (first alteration added.)

TSA explains that they are not asking this Court to weigh the merits of either Cvetanovic's or Hopkins' grievances.  Rather, they are asking the Court to vacate both awards because of certain procedural errors in the arbitration process.  Those errors are as follows.

The Cvetanovic Award.  TSA argues that there are two reasons the Cvetanovic award should be vacated that do not apply to the Hopkins award.  First, Vernon implicitly found

Cvetanovic to have been terminated for just cause; consequently, his order of reinstatement exceeded Vernon's jurisdiction.  Second, Cvetanovic's reinstatement violates public policy.

Addressing the first argument, TSA contends that Vernon's finding that Cvetanovic had been "negligent" affirmatively answers the first part of the question posed to the Board: "Did [TSA] have just cause to discharge [Cvetanovic] for the reasons stated . . . and if not, what shall the remedy be?"[24]  (Davis Decl. Ex. 5 at 10.)  Having found that Cvetanovic was negligent, there must have been just cause for his termination; therefore, Vernon exceed his jurisdiction by reinstating him.  Because Vernon exceeded his jurisdiction, his award should be vacated.  See **Bhd. of Maint. of Way Employees**, 307 F.3d at 739-40.

In support of its argument, TSA cites two cases of the Fifth Circuit Court of Appeals: **Delta Queen Steamboat Co. v. Dist. 2 Marine Engineers Beneficial Ass'n**, 889 F.2d 599 (5th Cir. 1989), and **E. I. DuPont de Nemours and Co. v. Local 900, Int'l Chem. Workers Union, AFL-CIO**, 968 F.2d 456 (5th Cir. 1992) (per curiam).  In both cases, an award reinstating a discharged employee was affirmed.  The employee in **Delta Queen Steamboat Co.** was a steamboat pilot who had been fired after his unauthorized attempt to pass a barge resulted in a  near-collision between the two vessels.  889 F.2d at 600-01.  The CBA at issue provided that a pilot would not be discharged "except for proper cause such as, but not

_____

[24]TSA emphasizes, in part, that portion of Vernon's decision finding that Cvetanovic "could and should have done more that he did. . . .  [H]e should have been more diligent and vigilant in questioning the flight attendant and the gate agent.  For instance, he could have, and should have, asked the gate agent what she meant when she said she had a crew member 'still on vacation. . . .'" (Davis Decl. Ex. 5 at 22.)

limited to, . . . carelessness . . . ." **Id.** at 601 (alterations added; emphasis omitted). The arbitrator found that the pilot had been "grossly careless," but was also the victim of disparate company discipline and that it would be unfair, considering his length of service, for him to be fired. **Id.** The arbitrator's decision was vacated. The court held that under the CBA, once the arbitrator found "proper cause," the decision for what discipline to impose shifted to management. **Id.** at 604. "If a [CBA] defines 'proper cause' to include a nonexhaustive list of offenses, an arbitrator cannot ignore the natural consequence of his finding that a listed offense was committed." **Id.** (alteration added).

The employees in **DuPont** were fired after they were discovered smoking marijuana on company property. 968 F.2d at 457. The issue for arbitration was phrased similarly to the one in Cvetanovic's case. The arbitrator found that the employees had used marijuana on company property and that discharge was an available punishment. **Id.** at 458. He concluded, however, that less serious punishment was more appropriate. **Id.** The court held that the arbitrator had implicitly found that just cause existed, and, therefore, did not need to "recite the operative phrase 'just cause.'" **Id.** Because the parties' stipulated phrasing of the issue before the arbitrator left him no choice as to discipline if he found just cause for the employees' discharge, the arbitrator's decision reinstating them exceeded his authority. **Id.**

In the instant case, the arbitrator did not find, explicitly or implicitly, that TSA had "just cause" for discharging Cvetanovic for the reasons listed in the letter. The letter of termination had charged him with three violations and the focus of his meeting with White,

who had made the decision to terminate him, was on Cvetanovic's delay in meeting White. The arbitrator found no merit in that charge or the charge about attempting to coerce Greer into changing her report. The arbitrator found some merit to the charge about allowing an intoxicated passenger to board the plane, but did not find his conduct to be as egregious as alleged.

Additionally, the two cases cited by TSA were distinguished by a latter decision of the Fifth Circuit, **Weber Aircraft, Inc. v. General Warehousemen and Helpers Union Local 767**, 253 F.3d 821 (5th Cir. 2001). Noting that the CBA at issue could be interpreted as authorizing a range of punishments for the conduct violation the employee had been determined to have committed, sexual harassment, the court found that the arbitrator's decision that a lesser sanction than that imposed by the company should be imposed drew its essence from the CBA. **Id.** at 824. In distinguishing the two earlier cases, the court held that, "[t]he restrictive CBA provisions in those cases . . . prevented the arbitrators from adopting arguable constructions or applications more favorable to the employees. . . . So long as the arbitrator arguably construed or applied the CBA at issue and acted within the scope of his authority, we must affirm." **Id.** at 825 (alteration added).

In the instant case, there is no comparable provision in the CBA mandating termination for an offense such as the one the arbitrator found Cvetanovic to have committed. Additionally, there are no provisions limiting the options an arbitrator has in reviewing company discipline.

TSA also argues that Vernon's decision must be vacated because it is a violation of public policy.

An arbitration award can be vacated on public policy grounds if the award "would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." **Misco**, 484 U.S. at 43 (interim quotations omitted). Accord **Eastern Associated Coal Corp. v. United Mine Workers, Dist. 17**, 531 U.S. 57, 62 (2000); **MidAmerican Energy Co. v. Int'l Bhd. of Elec. Workers Local 499**, 345 F.3d 616, 620 (8th Cir. 2003). See also **Union Pacific R.R. Co. v. United Transp. Union**, 3 F.3d at 255, 260-61 (8th Cir. 1993) (applying the Misco holding to cases under the RLA). The question is not whether the infraction at issue itself violated public policy, but whether reinstatement of the grievant does. **Eastern Associated Coal Corp.**, 531 U.S. at 62-63.

The Eighth Circuit answered this question in the employer's favor in **Union Pacific R.R. Co.**, 3 F.3d at 262. The grievant in that case was a railroad employee who had been terminated for using drugs and alcohol and who had caused several cars of a train to run through and damage a switch. **Id.** at 256-57. The arbitrator had ordered him reinstated without requiring any safeguard to protect the public from the employee working under the influence of drugs or alcohol. **Id.** at 262. Citing federal regulations establishing a comprehensive scheme of testing to ensure that railroad workers were not under the influence, the court found the unqualified reinstatement to be a violation of the "well-defined

and dominant public policy against a railroad's employment of individuals whose impaired judgment due to the use of drugs or alcohol could seriously threaten public safety." **Id.** at 261-62. Remanding the case for further proceedings to determine whether the worker had indeed been under the influence, such not having been established at the arbitration hearing, the court noted that it would have to enforce the award if the arbitrator had found the worker under the influence of drugs in the past but could, after counseling or treatment, be trusted to work without posing a threat to the public. **Id.** at 262. The court further noted that the arbitrator's unqualified reinstatement order placed the railroad at risk of violating Federal Railroad Administration regulations. **Id.**

In support of its argument that Vernon's reinstatement order violates public policy, TSA points to two laws that it says establish that policy, 49 U.S.C. § 44702(b)(1)(A) and 14 C.F.R. § 121.575(c). The former provides that, when issuing certain aviation certificates, the Administrator of the Federal Aviation Administration ("FAA") shall "consider . . . the duty of an air carrier to provide service with the highest possible degree of safety in the public interest[.]" 49 U.S.C. § 44702(b)(1)(A) (alterations added). The latter provides that "[n]o certificate holder may allow any person to board any of its aircraft if that person appears to be intoxicated[.]" 14 C.F.R. § 121.575(c) (alterations added).

TSA's reliance on these provisions is unavailing. First, the public policy expressed therein applies to the certificate holder, TSA. The FAA's assessment of a penalty against TSA for violating its regulation was premised on a finding that Cvetanovic permitted Padden

to be boarded knowing that Padden was obviously intoxicated. Vernon, whose factual findings TSA acknowledges are not at issue in this proceeding, did not reach a similar finding. Second, the statutory provision is general and not "well defined" and, as to the regulatory provision, there is no support in the arbitration proceedings for TSA's contention that Cvetanovic violated that public policy. The arbitrator found that Cvetanovic was negligent and erred in his judgment about Padden's "state of intoxication." (Compl. Ex. 5 at 22.) Cf. **Alvey, Inc. v. Teamsters Local Union No. 688**, 132 F.3d 1209, 1212 (8th Cir. 1997) (rejecting company's argument that arbitrator's order reinstating employee who was arrested as he drove away from plant, charged with possession of cocaine after a vial with traces of cocaine was found in his car, and later found guilty was not in violation of the public policy, established by federal and state statutes and regulations, against illegal drugs in the workplace because the company had failed to prove that the employee had knowingly possessed the cocaine at work). Padden was already on board, and Cvetanovic was the third "line of defense" to screen intoxicated passengers. (Compl. Ex. 5 at 21.) Moreover, the ALJ for the NTSB, charged with hearing the complaint filed by the Administrator of the FAA to suspend Cvetanovic's certificate for sixty days, determined, after hearing the testimony of Greer, Simmons, and Cvetanovic, that "[t]here's a lot of suggestion in the Administrator's order that just hasn't been established by the facts" and that a thirty-day suspension was more appropriate. (Davis Decl. Ex. 10 at 16.) Thus, the FAA, the agency administering the regulation cited by TSA, and the NTSB implicitly found that public policy required only a suspension. Third, the issue of Padden boarding the plane was only one of three charges

listed as grounds for Cvetanovic's termination and was not the issue that was the subject of his meetings with TSA management. Clearly, if public policy required his termination for allowing Padden to board, the issue would have been given more attention during those meetings.

In a case cited by TSA, **Delta Air Lines, Inc. v. Air Line Pilots Ass'n**, 861 F.2d 665 (11th Cir. 1988), the court observed "that, in the case before us, we have the *rare* example of an award the enforcement of which would violate clearly established public policy which condemns the operation of passenger airliners by pilots who are under the influence of alcohol." **Id.** at 671 (emphasis added). As it was in that case, the violation of a public policy "'must be clearly shown if an award is not to be enforced.'" **Homestake Mining Co. v. United Steelworkers of Am.**, 153 F.3d 678, 680–81 (8th Cir. 1998) (quoting Misco, 484 U.S. at 43). TSA has failed to establish that there is a clear violation of a public policy, rendering this to be one of the rare cases when such a violation requires an award reinstating an employee be vacated.

Perhaps in the instant case "reasonable people can differ as to whether reinstatement or discharge is the more appropriate remedy[,]" **Eastern Assoc. Coal Corp.**, 531 U.S. at 67 (alteration added); however, "both [TSA] and [ALPA] agreed to entrust this remedial decision to an arbitrator," **id.** (alterations added), and that arbitrator found reinstatement to be the proper remedy. His award shall be enforced.

The Hopkins Award.  TSA argues that the award reinstating Hopkins must be vacated because it was issued without providing TSA an executive session, as the parties agreed.

As noted above, the RLA provides that "[a] majority vote of all members of the . . . [Board] eligible to vote shall be competent to make an award with respect to any dispute submitted to it."  45 U.S.C. § 153, First(n) (alterations added). The majority voting on the case must have heard the matter and participated in the decision-making process. **Jones v. St. Louis-San Francisco Ry. Co.**, 728 F.2d 257, 262 (6th Cir. 1984) (vacating arbitrator's award on grounds that two of the three-member board voting in the majority had been placed on board after the hearing).

In the instant case, it is undisputed that the three Board members who voted to reinstate Hopkins heard the matter and participated in the decision-making process.  Nor is there any allegation that all five Board members did not participate in the deliberations about what award was to be made.  See **Id.** at 263.

It is disputed, however, whether there was an agreement about the procedure to be followed once Flagler issued his decision.  TSA contends, with support by its Board member Kukowski, the agreement was that the decision would be circulated to all members to provide any an opportunity to request an executive session.  ALPA counters, with support by Davis, that there was no such agreement.  It is also undisputed that the decision was not circulated to all Board members prior to its issuance and that no request for an executive session was made, even after the receipt by all members of the decision.

In **Ass'n of Flight Attendants v. Aloha Airlines, Inc.** 158 F.Supp.2d 1200 (D. Ha. 2001), cited by TSA, the discharged employee's grievance was heard by a three-member board. After the hearing but before the neutral member issued his decision, one of the board members left. **Id.** at 1202-03. The neutral member then issued a unilateral decision to deny the grievance, without consulting with the other board member. **Id.** at 1203. That member, the union board member, countered with her decision granting the grievance. **Id.** Subsequently, an employer board member was named to replace the departed one and, after reviewing transcripts, exhibits, and briefs but without consulting with either of the other two board members, issued a concurrence to the neutral's decision. **Id.** The court found that, although a majority of the board that had heard the arbitration had remained on the case, those two members could not reach a majority decision; consequently, the case had to be re-arbitrated. **Id.** at 1208.

The court noted, but did not discuss, the union's assertion that the board members had agreed at the hearing that the neutral "would prepare a draft opinion to circulate to other members, who would have the chance to comment on and discuss it at an 'executive session' to be held later." **Id.** at 1203 n.4. A similar assertion is made in the instant case by TSA. Whether there was such an agreement is disputed, however, and there is no contention that Flagler's decision is not the decision of the majority of the Board or that a request for an executive session was made but denied or ignored after the decision was circulated. Given

the broad procedural discretion of arbitrators, **Finley**, 312 F.3d at 947, the Court finds the assertion of TSA to be an insufficient basis on which to vacate the arbitrator's decision.

Discovery Rulings. TSA's last argument applies to both the Cvetanovic and Hopkins awards. TSA argues that both must be vacated because the arbitrator's order in each permitting ALPA discovery was not permitted by the CBA and allowed something, discovery, that was specifically rejected during CBA negotiations.

When construing or applying a provision in a CBA that is silent or ambiguous, an arbitrator must consider, inter alia, "the parties' negotiating history and other extrinsic evidence of their intent." **Bureau of Engraving, Inc. v. Graphic Commc'ns Int'l Union**, 164 F.3d 427, 429 (8th Cir. 2000). Accord **Alvey, Inc.**, 132 F.3d at 1212-13. "An arbitrator's paramount obligation is to apply the parties' agreement in a way that gives effect to their intent." **Boise Cascade Corp. v. Paper Allied-Indus. Workers**, 309 F.3d 1075, 1081 (8th Cir. 2002). However, "[t]he manner in which the Board resolves evidentiary disputes 'does not fall within any of the narrow jurisdictional grounds for review under 45 U.S.C. § 153 First (q)." **Finley**, 312 F.3d at 947 (alteration added).

The CBA provides that the arbitrator may, at his or her own discretion, "subpoena witnesses or evidence." (Def. Att. A at 57.) TSA argues that this does not apply to pre-hearing discovery; indeed, the right to such discovery was asked for by ALPA during negotiations and was consistently rejected by TSA. The issue is not, however, whether ALPA had the *right* to discovery. Rather, the issue is whether the arbitrator exceeded his

jurisdiction by granting ALPA a portion of its requested discovery. The silence of the CBA on this issue is not resolved by the parties' negotiating history about a different issue. Although both involve discovery, the question of the union's right to discovery is not the same as the question of the arbitrator's right to grant discovery at the request of one party after both parties have argued their respective positions.

TSA also argues that its due process rights were violated when the arbitrator granted ALPA limited discovery. Arbitration decisions "are reviewable for possible due process violations." **Goff v. Dakota, Minn. & Eastern R.R. Corp.**, 276 F.3d 992, 997 (8th Cir. 2002). "Under the RLA provisions governing Board hearings, due process requires that: (1) the Board be presented with a 'full statement of the facts and all supporting data bearing upon the disputes,' 45 U.S.C. § 153, First (i); and (2) the '[p]arties may be heard either in person, by counsel, or by other representatives . . . and the . . . Board shall give due notice of all hearings to the employee.' 45 U.S.C. § 153 First (j)." **Id.** (alterations in original).

TSA argues that, because the arbitrator granted ALPA limited discovery, ALPA had a preview of TSA's case but TSA did not have one of ALPA's case. TSA does not dispute that it had all the evidence at hand or argue that ALPA was in possession of any evidence that TSA needed to obtain through discovery. In short, there is no allegation that the arbitrator's decision denied TSA a "full and fair opportunity to present its position" on the relevant issues in either case. **Armstrong Lodge No. 762 v. Union Pacific R.R. Co.**, 783 F.2d 131, 135 (8th Cir. 1986).

ALPA's Request for Attorney's Fees. In addition to requesting that the two awards be enforced, ALPA requests an award of attorney's fees. ALPA contends that such a award is merited because "TSA has no justification . . . for failing to comply" with the two awards and "is a repeat offender." (Pl. Mem. at 20.)

"It is a well-established rule that attorneys' fees are not ordinarily recoverable by a successful litigant in the absence of a provision therefor in a statute or enforceable contract." **Air Line Pilots' Ass'n v. Northwest Airlines, Inc.**, 415 F.2d 493, 498 (1969). Title 45 U.S.C. § 153 First (p) does not provide for an award of attorney's fees in RLA cases involving air carriers. **Id.** at 498-99. Accord **Int'l Ass'n of Machinists v. Trans World Airlines, Inc.**, 1 F.Supp.2d 983, 985 (E.D. Mo. 1998). There is an exception to this well-established rule, commonly known as the American Rule, permitting an award of attorney's fees when a "party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" **Kelly v. Golden**, 352 F.3d 344, 352 (8th Cir. 2003) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)). "An unjustified refusal to abide by an arbitrator's award may constitute bad faith for the purpose of awarding attorney's fees." **Int'l Union, United Auto. Workers v. United Farm Tools, Inc.**, 762 F.2d 76, 77 (8th Cir. 1985) (per curiam).

The Court finds that TSA's refusal to abide by the arbitrator's awards in the Cvetanovic and Hopkins cases is incorrect, but not unjustified. See **Dial Corp. v. Auto., Petroleum and Allied Indus. Employees Union**, 192 F.Supp.2d 993, 997 (E.D. Mo. 2002).

## Conclusion

For the foregoing reasons, the Court finds that the arbitrators' awards in the Cvetanovic and Hopkins cases drew their essence from the CBA between TSA and ALPA. Accordingly,

**IT IS HEREBY ORDERED** that the summary judgment motion of plaintiff, Air Line Pilots Association ("ALPA"), is **GRANTED** insofar as the arbitration awards are to be enforced and **DENIED** as to the request for attorney's fees.  [Doc. 17]

**IT IS FURTHER ORDERED** that the summary judgment motion of defendant, Trans States Airlines, Inc. ("TSA") is **DENIED**.  [Doc. 21]

**IT IS FINALLY ORDERED** that the parties shall file a Joint Proposed Judgment within ten (10) days of the date of this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of September, 2007.