UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case number 4:06cv0872 TCM ) |
| TRANS STATES AIRLINES, LLC, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The present dispute between Air Line Pilots Association, International ("ALPA"), and Trans States Airlines, LLC ("TSA") has its origins in litigation begun in 2006 after the Trans States Airlines Pilots' System Board of Adjustment ("the Board") issued two awards, pursuant to the Railway Labor Act, 45 U.S.C. § 151-188 ("RLA"), which TSA wanted vacated. By Judgment of September 25, 2007, the Court[1] enforced the awards, ordering that the two captains who were the subject of the awards be reinstated with back pay, as determined by the Board. Subsequently, the parties resolved the issues relating to one captain and the Board issued a remedial award relating to the other captain, Paul Hopkins. That award of $162,249.50 in back pay gave rise to the present dispute. In its motion for summary judgment, TSA requests that the award be vacated. In its cross-motion for summary judgment, ALPA requests that the award be enforced.

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties in both its earlier and present stages. See 28 U.S.C. § 636(c).

**Background**

Captain Hopkins ("Hopkins") worked as a pilot for TSA from July 1998 until his discharge in March 2005. (Pl. Stip.[2] ¶ 7.) The question before the Board after the Court ordered an earlier award enforced was the amount of back pay and benefits to be paid Hopkins. (Id. ¶ 11.) TSA argued that no back pay was due because Hopkins failed to mitigate his damages and that any award would violate public policy. (Jt. Appx. 11 at 1010, 1011.[3]) ALPA contended that Hopkins should receive an amount in excess of $217.000, an amount which allegedly would place Hopkins in the position he would have been in but for the wrongful discharge. (Id. at 1015.)

Hearings were held before the Board in December 2007 and February 2008. (Pl. Stip. ¶ 11.) The neutral chairman was arbitrator John Flagler; the ALPA-appointed members were Jason Ruszin and Andrew Freeman, both pilots; the TSA-appointed members were Eric Kukowski and Warren Crotty. (Id.) Hopkins and Martin Sobol, an analyst with ALPA, testified on behalf of ALPA at the first hearing. (Jt. Appx. 3.) Edward Phelps, a TSA flight operations manager, and Randall Zehnder, TSA chief pilot, testified on behalf of TSA. (Id.) Christopher Beebe, a pilot for U.S. Airways, testified at the second hearing on behalf of ALPA; Zehnder again testified on behalf of TSA. (Jt. Appx. 5.)

---

[2] "Stip." refers to a party's statement of uncontroverted material facts that are not disputed by the opposing party.

[3] When citing to the parties' appendix, the Court will refer to the pagination of the individual exhibits.

The hearing testimony and the parties' stipulations establish the following relevant facts.

Hopkins was fired on March 16, 2005, for "fraudulent non-revenue travel" after allegedly allowing a former TSA employee to use his travel pass. (Jt. Appx. 1.) In early November 2006, a friend called him and asked if he would be interested in working for another airline, Spirit Airlines ("Spirit"), where another friend, also a former TSA employee, worked. (Jt. Appx. 3 at 146.) He was, and was hired. (Id. at 148.) This was the first time since being fired from TSA that he sought airline employment. (Id. at 146.) On the third day of his training with Spirit, the Director of Operations summoned him from a classroom and asked about his termination from TSA and whether he had disclosed such on his application and during his interview.[4] (Id. at 155-56.) Hopkins gave the captain representative a copy of the award reinstating him, and that was the last he heard of the matter. (Id. at 157.) His reinstatement had been ordered by the Board in May 2006. (Pl. Stip. ¶ 8.)

Hopkins testified at the hearing that he had not sought employment as a pilot before November 2006 because the likelihood of him obtaining such employment was low and any wages at a place that would hire him would also be low. (Jt. Appx. 3 at 91, 92.)

---

[4]Hopkins testified as follows at the hearing. "I was summoned from the classroom by Jeffrey Carlson, the Director of Operations at Spirit Airlines. He had a question for me about my prior employment at Trans States. I was taken into an office. I'm not sure whose office it was, but he asked me if I had been fired from a previous employer, and I told him that indeed I had. He asked me if I had disclosed that on my application, and I said yes, I had. He asked me if I talked about it during my interview, and I affirmed that I had. I had been completely honest with them about it. He had the file in his hand of what appeared to be facsimile documents over a fax machine, and the top document that he had was a copy of my termination letter from Trans States. He seemed very interested in them, and I honestly felt as if I were going to lose my job." (Jt. Appx. 3 at 156.)

Phelps, in charge of staffing for TSA, testified that he could not name any pilot working for TSA who had previously been discharged from another airline. (Jt. Appx. 3 at 232, 242.) Zehnder, who supervises TSA's pilots, testified that he would not hire a pilot who had been fired from another airline for the offense, fraudulent use of a travel pass, given for Hopkins' discharge. (Id. at 257.)

TSA's mitigation argument is directed to the period between March 20005 and November 2006, when Hopkins sought employment as a pilot.

In late 2004, Hopkins opened a motorcycle repair and service shop in St. Louis, Missouri. (Id. ¶ 17(f).) He worked part-time at this shop, the City Garage, until his discharge from TSA. (Id.; Jt. Appx. 3 at 92-94.) He devoted more time to the shop after his discharge in an attempt to make it a successful business venture, working an average of twelve hours a day. (Jt. Appx. 3 at 94, 109.) He set up suppliers for inventory at the shop, obtained a business license, and set up a web page. (Id. at 102-03.) He did a variety of tasks at the shop, including bookkeeping, sweeping the floor, working on motorcycles, and taking orders for parts. (Id. at 112.) He began the shop with a $5,000 line of credit from his bank and increased it to $80,000 after his discharge. (Id. at 104-05.) Ultimately, he invested – and lost – $150,000 in the shop. (Id. at 108.) He had intended that the shop be a money-making venture. (Id. at 107.)

Arbitrator Flagler held that Hopkins "need not" defend his choice of not seeking employment at other airlines because his explanation that he "firmly expected" to be rejected

as an applicant for a pilot position was a sufficient reason for his inactivity.[5]  Indeed, no evidence that any airline would hire a pilot who had been discharged by a previous employer for fraudulent non-revenue travel was presented at the hearing.  (Pl. Stip. ¶ 17(e).)  Moreover, Hopkins' pessimism about his employment chances was understandable given the airline industry's responsibility for ensuring the safety of the flying public, as manifested by the requirement established by the Pilot Records Improvement Act, 49 U.S.C. § 44936, that copies of any disciplinary and discharge notices from previous airlines be provided to any carrier considering an employment applicant.  (Jt. Appx. 11 at 11-12.)  Consequently, any airline considering Hopkins for employment would have received notice of his discharge from TSA and the reasons for it.  (Id. at 12.)  Indeed, when Hopkins did find employment, with the assistance of a friend, as a pilot at Spirit he was faced with discharge after the airline received notice of his termination from TSA and avoided such by being able to produce the Board's award exonerating him from the accusation that was the basis of the termination.  (Id.)

The arbitrator also rejected the challenge to Hopkins' interim earnings, i.e., that he had not acted reasonably in pursuing his motorcycle parts and repair business.  Rejecting TSA's argument that Hopkins' decision to go into business for himself was unreasonable given his lack of experience as an entrepreneur, the arbitrator held that such prior experience was not

---

[5]The arbitrator's award was joined, with exceptions not relevant to the instant dispute, by the ALPA members and dissented to by the TSA members.  (Pl. Stip. ¶ 12.)  For ease of reference, the Court will simply refer to either "the award" or to "the arbitrator."

a prerequisite to embarking on a business venture. (Id. at 13.) The arbitrator found that, although Hopkins had failed to make a profit at the shop, he had made "energetic and well-considered efforts to build a successful enterprise." (Id.) Such efforts included working long hours, establishing an on-line parts store, marketing his goods and services at motorcycle races, and providing a "respectable range of services," e.g., tire and oil changes, general repair and maintenance, sale of goods, and storage. (Id.) During one of the two years in question, 2006, his sales increased by more than 250%. (Id.) Any profit was lost due to rising overhead costs. (Id.) And, the eventual failure of the shop was due to competition from e-bay and the destruction of a large portion of the shop building. (Id.) Thus, Hopkins' failure to make a profit at his shop was not a failure to mitigate damages.[6] (Id.) Rather, his operation of the shop and his subsequent employment at Spirit satisfied his duty to mitigate back pay damages. (Id. at 14.)

In addition to challenging Hopkins' mitigation of damages, TSA argues that payments made by ALPA to Hopkins between his airline jobs were loans in violation of § 503(a) of the Labor Management Reporting and Disclosing Act, 29 U.S.C. § 503(a). Section 503(a)

---

[6]In support of this conclusion, the arbitrator cited Smith v. Great American Rests., Inc., 969 F.2d 430 (7th Cir. 1992). The court held in that case that an employment discrimination plaintiff terminated from her position as a restaurant manager had not failed "to exercise reasonable diligence in attempting to mitigate damages by finding comparable work" when she tried to open her restaurant. Id. at 438. Although there were manager positions within an hour and half of her home, her decision to start her own business was a reasonable alternative. Id. "[T]he plaintiff's burden to mitigate damages does not require success, but only an honest, good faith effort." Id.

prohibits a labor union from making a loan to an officer in excess of $2,000.00.[7] During the relevant period, Hopkins was chairman of ALPA's local executive committee and a captain representative. (Def. Stip. ¶ 18.) Section 60 of ALPA's Administrative Manual authorizes flight-pay loss payments to union officials who are found to have been suspended or discharged because of their union activities. (Plf. Stip. ¶ 20; Jt. Appx. 7 at 425-26.) This section further provides that "any monies paid such suspended or discharged member by his carrier as result of a grievance decision, or earlier in the grievance process, shall be repaid by the member to ALPA up to but not exceeding that amount received from ALPA in the form of flight pay loss." (Id. at § 60(5)(c).)

The ALPA executive council met in April 2005 and approved, at the request of the Trans States Master Executive Council, flight pay loss of 85 hours per month to Hopkins. (Pl. Stip. § 21.) Hopkins received a total of $161,798.87 in Section 60 payments. (Id. ¶ 22.) This amount was reduced by his interim earnings at Spirit. (Id.)

Hopkins testified that he will reimburse ALPA for the Section 60 payments if he receives a back pay award. (Jt. Appx. 3 at 86.) He further testified that he is under no obligation to do so. (Id.) Beebe testified that Hopkins is obligated to return the Section 60 payments if there is a back pay award; if there is no back pay recovery, there is no obligation. (Jt. Appx. 5 at 29.)

---

[7] Section 503(a) reads: "No labor organization shall make directly or indirectly any loan or loans to any officer or employee of such organization which results in a total indebtedness on the part of such officer or employee to the labor organization in excess of two thousand dollars."

TSA argued to the Board that any back pay award to Hopkins should be reduced by the Section 60 payments. TSA also argued that the Section 60 payments were a loan, in violation of 29 U.S.C. § 503(a), and consequently any award of back pay would be a violation of public policy.

The arbitrator rejected TSA's arguments. First, the term "flight pay loss" in Section 60 did not, in the instant dispute, have its usual connotation of a reimbursement by the union to a company for payments by the company to the pilot for time spent on union activities which would otherwise have been "in gainful work activities." (Id. at 15.) Rather, in the instant dispute, flight pay loss was understood to be "wage loss incurred by [Hopkins] where flight time was denied him by [TSA's] unjust action in discharging him." (Id.)

Second, the arbitrator found that the Section 60 payments were not a loan because Hopkins was not obligated to reimburse ALPA unless and until "he receive[d] a make-whole remedy payment from [TSA]." (Jt. Appx. 11 at 14.) "'All or nothing' may characterize the terms of a poker bet but certainly would never describe those of a true loan.'" (Id. at 15.) And, the purpose of Section 60 – "to protect the elected leaders of ALPA members from discriminatory disciplinary treatment attributable to anti-union animus" – served to benefit ALPA's members rather than to harm them, as contended by TSA in its public policy argument that Section 60 payments exposed union members to an abuse of fiduciary trust. (Id.)

In conclusion, the arbitrator's award mirrored ALPA's proposed make-whole remedy with three exceptions not now at issue.

## Discussion

<u>The Railway Labor Act.</u>[8] "Judicial review of an arbitration award is very limited, and review of the decision of a public arbitration board under the Railway Labor Act 'is among the narrowest known to the law.'" **Finley Lines Jt. Protective Bd. Unit 200 v. Norfolk Southern Ry. Co.**, 312 F.3d 943, 946 (8th Cir. 2002) (quoting <u>Bhd. of Maint. of Way Employees v. Terminal R.R. Ass'n</u>, 307 F.3d 737, 739 (8th Cir. 2002)). Thus, an arbitration award "may be set aside . . . 'for failure of the order to conform, or confine itself, to matters within the [arbitrator's] jurisdiction,'" **id.** (quoting 45 U.S.C. § 153 First (q)), for failure to comply with the provisions of the RLA, or for fraud or corruption," **Bhd. of Maint. of Way Employees v. Soo Line R. Co.**, 266 F.3d 907, 909 (8th Cir. 2001). An arbitrator's award may not be set aside on its merits "'despite allegations that the decision rests on factual errors or misinterprets the parties' agreement . . . .'" **Finely Lines**, 312 F.3d at 946 (quoting <u>Major League Baseball Players Ass'n v. Garvey</u>, 532 U.S. 504, 509 (2001)); <u>accord</u> **McGrann v. First Albany Corp.**, 424 F.3d 743, 749 (8th Cir. 2005). Consequently, "as long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely a brand of industrial justice, the award is legitimate." **Soo Line R. Co.**, 266 F.3d at 909. "'[C]ourts . . . have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim." **Garvey**, 532 U.S. at 509 (quoting <u>Paperworkers v. Misco, Inc.</u>, 484 U.S. at 29, 39 (1987)) (second and third alterations in

---

[8]Much of the following discussion on the standard of review under the RLA is taken from the Court's earlier Memorandum and Order.

original). Courts may consider whether the award "evidence[s] a manifest disregard for the law." **McGrann**, 424 F.3d at 749 (alteration in original) (internal quotations omitted). "An award manifests disregard for the law when an arbitrator clearly identifies the applicable, governing law, but then ignores it." **Id.**

TSA moves to vacate the award on the grounds that (1) the arbitrator exceeded his jurisdiction by ignoring the law and undisputed facts in finding that Hopkins mitigated his back pay obligations, and (2) the arbitrator's award violated public policy by essentially condoning a loan to him by ALPA, made in violation of 29 U.S.C. § 503(a).

Mitigation of Damages. TSA argues that Hopkins violated his duty to mitigate his back-pay damages by not seeking employment in the airline industry until applying for the pilot position with Spirit. Hopkins' self-employment effort at the non-income generating City Garage does not satisfy this duty. TSA also contests the arbitrator's finding that Hopkins' choice not to pursue a job in the airline industry was reasonable in light of Hopkins' status as a terminated pilot and of the reason for that termination. Moreover, the Section 60 payments to Hopkins erased any incentive he might have to seek other employment. The arbitrator, TSA argues, exceeded his jurisdiction in his mitigation decision by failing to follow existing law and by ignoring undisputed facts.

When an improperly-discharged employee is reinstated after an arbitration proceeding, the employee should be made whole for losses incurred because of the unfair labor practice. See **NLRB v. Midwest Hanger Co.**, 550 F.2d 1101, 1105 (8th Cir. 1977).

"Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses he willfully incurred." **Id.** "The employee must therefore make a reasonable search for interim employment." **Id.** This search does not require that the employee "go into another line of work, accept a demotion, or take a demeaning position." **Hartley v. Dillard's Inc.**, 310 F.3d 1054, 1061 (8th Cir. 2002) (addressing question of mitigation of damages in an age discrimination case). The former employee's "efforts to mitigate need not be successful but must represent an honest effort to find substantially equivalent work." **Id.**; accord **Newhouse v. McCormick & Co.**, 110 F.3d 635, 641 (8th Cir. 1997) (rejecting employer's argument that the employee failed to mitigate by accepting a part-time job and not seeking full time work after the employee began receiving social security income; employee had testified that there were no available openings in his field); **Smith**, 969 F.2d at 438 (rejecting argument that employee who had started own business had not mitigated damages; see note 6, supra). The reasonableness of the effort is evaluated in the context of "the individual's background and experience and the relevant job market." **NLRB v. Jackson Hosp. Corp.**, 557 F.3d 301, 307-08 (6th Cir. 2009). The employee's burden is not onerous; success is not required. **Id.** at 308.

"[S]elf-employment mitigates income loss." **Coronet Foods, Inc. v. NLRB**, 158 F.3d 782, 801 (4th Cir. 1998) (alteration in original) (holding that NLRB had not erred by counting former employee's self-employment wages and search for work outside normal line of work as mitigating his income loss). "It is . . . well settled that 'self-employment is an

- 11 -

adequate and proper way for the injured employee to attempt to mitigate his loss of wages,' Heinrich Motors, Inc. v. NLRB, 403 F.2d 145, 148 (2d Cir. 1968), and that 'a person is not required to look for other employment while he is reasonably engaged in self-employment,' id at 149." **F.E. Hazard, Ltd. v. NLRB**, 917 F.2d 736, 737 (2d Cir. 1990).

Additionally, "[t]he burden of proof . . . is on the employer to show the employee's failure to make a reasonable search [for interim employment]." **Midwest Hanger Co.**, 550 F.2d at 1105; accord **Hartley**, 310 F.3d at 1061; **Jackson Hosp.**, 557 F.3d at 308; **Tubari Ltd. v. NLRB**, 959 F.2d 451, 453 (3rd Cir. 1992) (citing similar case law in the 4th, 5th, and 9th Circuits).

In the instant case, there is evidence that Hopkins believed that there was little likelihood he would be hired by another airline because of stated reason for his termination by TSA. This belief is buttressed by testimony from TSA's flight operations manager who could not identify any TSA pilot who had been discharged by a previous airline and by testimony from TSA's chief pilot that he would not hire a pilot who had been fired for fraudulent use of a travel pass. Moreover, TSA produced no evidence that any airline would have hired a pilot who had been discharged for fraudulent non-revenue travel.

Hopkins' belief is also buttressed by events at Spirit. When, helped by a friend, he did secure a pilot position, he was summoned by Spirit's Director of Operations on his third day of training to explain his termination from TSA. The arbitrator found, supported by the

evidence, that Hopkins required the intervention of his friend who had sponsored him for the job and the production of the Board's award reinstating him to avoid another discharge.

Thus, the arbitrator's finding that Hopkins' assessment of the possibility of obtaining employment as a pilot was reasonable, and his conclusion that Hopkins did not fail to mitigate damages by not earlier pursuing airline employment is not a basis for vacating his award.

The arbitrator's conclusion that Hopkins did not fail to mitigate damages when he pursued his motorcycle business is also not a basis for vacating the award. Hopkins began his motorcycle sales and service business while employed as a TSA pilot. After his discharge, with a reasonable belief that reemployment as a pilot was unlikely, he began to take the business more seriously and to another level. He established business relationships with vendors, attended functions for motorcyclists, and advertised on the internet. He worked 70 hours per week, took out an $80,000 line of credit, and lost $150,000 on the business, although sales in 2006 exceeded $110,000. This venture, as noted by the arbitrator, was not a hobby. Rather, like many small business owners, Hopkins wanted to make a profit and devoted significant time, energy, and assets to doing so, but ultimately was unsuccessful, like many small business owners are.

TSA further argues that the Section 60 payments virtually replaced Hopkins' TSA wages, thereby eliminating any incentive Hopkins might have had to seek full-time employment as a pilot. Consequently, Hopkins did not mitigate his damages. In support of this argument, TSA cites **Aikens v. Banana Republic, Inc.**, 877 F. Supp. 1031 (S.D. Tex.

1995), an employment discrimination case in which the plaintiff did volunteer work after her constructive discharge following her reclassification to stock person. The court found that her failure to seek "a new paying job" did not satisfy her obligation to "reasonably or diligently [seek] employment substantially equivalent to her position" with her former employer. **Id.** at 1040.

Hopkins' delay in seeking airline employment and his self-employment efforts are not the equivalent to a former storeroom manager doing volunteer work rather than seeking a paying position. His delay was reasonably caused by a belief a search for a pilot job would be unsuccessful and his efforts to build his shop into an income-producing business were extensive and expensive, both in terms of time and money. "Self-employment can constitute employment for purposes of mitigating damages, as along as self-employment was a reasonable alternative to finding other comparable employment." **Smith**, 969 F.2d at 438. In **Brooks v. Woodline Motor Freight, Inc.**, 852 F.2d 1061, 1065 (8th Cir. 1988), the Eighth Circuit found that a discharged trucker had made reasonable, good faith efforts to mitigate his damages when refusing an employment offer from a trucking company to pursue his own business venture and protect his investment in that venture, begun with his own savings. And, in **Newhouse**, 110 F.3d at 641, the court found that a discharged employee had used reasonable diligence in seeking full-time employment when taking part-time work and supplementing his income with social security retirement benefits only after his applications for comparable, full-time work were unsuccessful.

The arbitrator found Hopkins made reasonable efforts to mitigate his damages. The Section 60 payments do not negate those efforts.

Public Policy. The Section 60 payments were, TSA argues, essentially a loan to Hopkins, in violation of 29 U.S.C. § 503(a), see note 7, supra; therefore, any back pay award is a violation of public policy. The arbitrator found that the payments were not a loan.

As noted above, ALPA's executive council approved payments to Hopkins under Section 60 of its administrative manual. In addition to authorizing payments under certain conditions, the section provides that ALPA is to be reimbursed for such payments if the payee receives any monies as a result of a grievance decision. Moreover, ALPA is to be consulted if any settlement is offered.

In support of its loan argument, TSA submitted the definition of "loan" that appears in Black's Law Dictionary 936 (6th ed. 1991): "'Delivery by one party to and receipt by another party of a sum of money, upon agreement, express or implied, to repay it with or without interest.'" (Jt. Appx. 11 at 14.)

"[W]here one party advances money to another, who in turn *agrees to repay a loan* with interest, there is a loan." **United States v. Basin Elec. Power Co-op.**, 248 F.3d 781, 804 (8th Cir. 2001) (emphasis added). A loan has been defined as a "transaction wherein an owner of property, called the LENDER, allows another party, the *borrower*, to use the property. The borrower customarily promises to return the property after a specified period with payment for its use, called INTEREST." Dictionary of Finance and Investment Terms 394 (7th ed. 2006). See also Dictionary of Finance and Banking 265 (4th ed. 2008) (defining

- 15 -

a loan as "money lent *on condition that it is repaid*, either in installments or all at once, on agreed dates and usually that the borrower pays the lender an agreed rate of interest (unless it is an interest- free loan)") (emphasis added). Thus, a loan requires either repayment or default. The Court, and apparently TSA, was unable to find any definition of the term "loan" that included a contingency for repayment.

The arbitrator found that there was no agreement, express or implied, that Hopkins repay ALPA the Section 60 monies paid him regardless of his circumstances. Instead, repayment is expressly contingent on Hopkins prevailing in his grievance challenge to his discharge. If Hopkins lost his grievance, he would not have to repay ALPA any money. Further, the arbitrator found that Section 60's purpose is to indemnify ALPA members at risk to their career, thereby financially protecting a member who elects to pursue a grievance or accept the responsibility of union leadership. The arbitrator's reasoning is within the broad discretion afforded him by the RLA.

## **Conclusion**

For the foregoing reasons, the Court finds that the arbitrator's award of back pay to Captain Paul Hopkins complies with the RLA, confines itself to matters within its jurisdiction, is not fraudulent or corrupt, is not irrational, and does not manifest a disregard for the law.[9] Accordingly,

---

[9] In a separate motion, ALPA argues that sanctions should be imposed on TSA for frivolous arguments. Although the Court finds the arguments unavailing, it disagrees that they support the imposition of sanctions. The motion will be denied.

**IT IS HEREBY ORDERED** that the motion of Trans States Airlines, LLC, for summary judgment and the motion of Air Line Pilots Association, International, for sanctions are each **DENIED**. [Docs. 45, 56]

**IT IS FURTHER ORDERED** that the cross-motion of Air Line Pilots Association, International, for summary judgment is **GRANTED**. [Doc. 46]

An appropriate Judgment shall accompany this Memorandum and Order.

/s/Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of February, 2010.